# CIRCUIT COURT OF BALTIMORE CITY.

Filed January 6, 1926.

MILLER RUBBER COMPANY
VS.
NATIONAL UNION BANK.

*Bartlett, Poe & Claggett* solicitors for plaintiff.

*Venable, Baetjer & Howard* solicitors for defendant.

SOLTER, J.—

This is the same case which went to the Court of Appeals upon a demurrer to the bill of complaint. It in-

volved the liability of the bank for certain customers' checks of the Miller Rubber Company, irregularly endorsed by its agents and deposited in the latter's account in the Union Bank instead of the Miller Rubber Company's account also in the Union Bank. The sufficiency of the bill was sustained by the Appellate Court. In this memorandum, as the dealings are between principal and agent, it may tend to keep the relationship always apparent by referring to "Factory" in place of complainant, "Branch" for Shuman and Robinson, except in some instances when reference is made to certain checks, and "Bank" as the defendant.

By the evidence in this case the factory has established the liability of the bank. The decision of the Court of Appeals deals with two questions raised by the bank as defenses; viz: lack of privity and the right to maintain this proceeding in an equity Court. The decision was adverse to the bank upon both points. The facts offered in evidence by the factory in no way differ from those set forth in the bill of complaint. The factory established the liability of the bank by proof that it, the bank, collected from the drawee banks the proceeds of checks which should have been deposited in the factory's account in the bank, but which by irregular endorsements were deposited instead to the credit of Shuman and Robinson, the proprietors of the branch. It further proved the arrangements under which the factory's deposit account was opened with the bank, the knowledge it had of the factory's signature, its knowledge of the relationship existing between the factory and the branch and also its knowledge that Shuman and Robinson had no authority to endorse checks drawn to the factory's order for their individual account. After proof of the diverted checks and the other facts above stated, it rested its case.

The defense of the bank is that these diverted checks were subsequently made good by Shuman and Robinson. In the examination of the witness Grancecum, the auditor of the factory, its ledgers were offered in evidence and it appeared from them that these diverted checks had been given by factory customers in payment of certain specified invoices, and that the factory had credited these customers with payments of the same invoices to the extent of $16,951.58 by later deposits in

the factory's bank account made by the branch. The bookkeeping arrangements of the factory and the branch are as follows: The factory and the branch kept full sets of books and the ledgers of both should show identical entries in the customers' accounts. The customers' debits were entered in the factory ledger through duplicate invoices sent daily by the branch and they received credits on the factory ledger through "Remittance advices," also sent daily by the branch. The "Remittance advices" purported to show customers' payments received by the branch and these were supported by a duplicate deposit slip purporting to show the deposits made in the bank of these customers' payments. Usually there was also deposited in the factory's bank account the amount of any cash sales made by the branch and these were also included in the "Remittance advices." By this system the entries in the factory ledger and in the branch ledger upon customers' account would be precisely the same. In the examination of the affairs of the branch after the discovery of the irregularities of Shuman and Robinson a large number of copies of deposit slips were discovered by the factory's auditor. Opposite the items on these deposit slips were notations showing the name of the customer whose check made up part of the deposit. It was clearly shown by these deposit slips and notations that the practice of the branch was to make deposits in the factory account in the bank of certain customers' checks and send on remittance advices which would advise a credit upon a customers' account which in point of fact had been made by him prior thereto, but whose check had been diverted. It might be stated in passing that the branch always kept its accounts with the customers with accuracy according to his actual purchases and the payments reported to the factory and relied upon certain symbols on the ledger to enable Shuman and Robinson to know how these accounts stood with the customer. Of course a comparison of the factory ledger with the branch ledger would not have shown the irregularities. *It can be readily seen, that unless there was deposited in the bank by the branch money or checks which actually belonged to Shuman and Robinson the branch was merely accounting for a part of the money actually belonging*

*to the factory.* The factory in acting upon the remittance advices sent in by the branch was in practically every instance making entries in the ledger which did not correspond with the payment actually made by its customers. It should be noted at this point that the goods sold were at all times until sale the property of the factory and not the property of the branch. It should be further noted that the indebtedness created by the sale was an indebtedness from the customer to the factory and not to the branch; and further, when a customer's check was received in payment for the goods represented by invoices, this check was always the property of the factory and not of the branch. The branch was merely the agency through which it dealt with its customers. As between the branch and the factory, the latter was not bound by any remittance advices which did not truthfully portray the customer's dealings. It was entirely proper for the factory when the true state of facts became known to recast its books in accordance with what any particular customer had actually bought and what he had in fact did, so far as it was possible, after knowledge of the defalcations. It first took steps to secure from the customers as many as possible of the checks they had sent in to the branch and those which had been diverted to the use of Shuman and Robinson by their irregularities thus became the items of this particular suit.

By the fraudulent practices of stealing one check and using another which also belong to the factory to conceal the theft, B's check was made to pay A's bill on the books of the factory; but it is obvious that as between the factory and the branch, A's bill nevertheless was unpaid and the whole structure of fraudulent accounting had to fall and be restored to a state of truth. I therefore hold that merely because the customer's account has become credited through the fraudulent remittance advices they cannot be allowed as credits against the diverted checks. The basic rule obviously underlying the condition of affairs is that the only credits which can be allowed against diverted checks would be funds which were absolutely the property of Shuman and Robinson and which can in some way be shown to have been paid to the factory. Nor can it be assumed that these ledger credits

show even prima facie that Shuman and Robinson made restitution of the diverted checks through the medium of remittance advices and supporting deposits in the factory bank account. as the basis of this credit was always the factory's bank account it must be assumed as a starting point that the money placed there by the branch was customer's money and not money of Shuman and Robinson. In other words, the remittance advices and the deposit of funds by the branch to support such advices can, standing alone, raise no presumption of restitution. The customer's account having been stolen by the branch, it should not be, that a direction to the factory to mark the customer's account paid, with a deposit not definitely shown to be money of the branch should be considered proof of restitution. The burden of proving restitution should be carried to the point of affirmatively showing that the deposit was made up of funds which actually belonged to Shuman and Robinson. For this reason I decline to allow as credits upon the diverted checks the ledger entries based upon the remittance advices.

After the factory rested its case by proof of the diverted checks some checks of Shuman and Robinson made payable to the factory were offered in evidence by the bank. Some of these were shown to have been deposited by the branch in the factory bank account. They have been called "Restitution checks." The bank claims that it is entitled to a credit by virtue of these restitution checks. These checks represent certain types of transactions which may be classified as follows:

Class I.—These include checks sent directly by the branch to the factory and never went into the factory bank account, such for example, as checks used for the payment of notes of Shuman and Robinson, or to pay their personal indebtedness. These checks obviously are in no sense restitution checks and cannot be allowed as credits.

Class II.—These include certain checks usually for very large sums deposited in the factory bank account but which were traced as being the proceeds of diverted checks and as they are merely factory checks in truth, no credit can be allowed by virtue of them.

Class III.—These restitution checks, so called, were placed in the factory's

deposit in the Union Bank, and the remittance advice, upon which this deposit was based, directed that certain customers' accounts be credited with amounts aggregating the deposit. By this procedure the restitution check in question was necessarily divided among the customers specified in the advice. Thus it happened in some instances that the restitution check in fact went to the credit of customers whose accounts the factory has not attempted to prove were embezzled. The total embezzlements, however, are largely in excess of the bank's claim. The bank demands credit for this class of checks, but makes no claim for any definite sum as constituting such credit. It might be contended that as this money went to the credit of persons whose accounts had not been proved were embezzled, it necessarily operates as restitution upon the embezzled accounts. This would doubtless be true except for the necessary inference which flows from the remittance advice.

Is the Court to assume that this payment of a customer's account is a voluntary payment by the branch, or is it not its duty to assume that such payment would not have been made by the branch unless there had, as a matter of fact, been an actual prior embezzlement of that particular customer's account. It would seem that the latter is to control.

The major difficulty under which the bank has labored in its efforts to prove that these restitution checks should be credited against the diverted checks is that all of them relate and refer to remittance advices and directions to apply them in a particular way. These directions are bound to create certain inferences which the bank is unable to rebut, because of the extent of the embezzlements and the absence of any reliable data or facts upon which to predicate any restitution, except in one type of cases. I refer to the instance where there are certain restitution checks and the remittance advices specifically direct a credit upon a customer's account whose checks have been diverted. This is the type of case testified to by the witness Grancecum. In these cases he took the diverted check and allocated it to certain invoices so that it would be definitely shown that these allocated invocies were the ones actually embezzled. Then when he did find a restitution check which had a remittance advice which could be applied to any invoice, it was done and the bank received credit therefor. Some of the propositions of accounting contended for by the bank would be sound in the case of a complete accounting. But these principles cannot be applied to a partial and fragmentary accounting in which only a portion of the dealings are presented and in which these are controlled by specific directions as to application of funds.

Upon the evidence in the case I will sign a decree for the complainants for *the sum of $26,895.82 with interest from the date of suit and costs.*